IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
GALVESTON DIVISION

| | | |
|---|---|---|
| GOODRICH OPERATING COMPANY, INC. and PETROGULF III, L.L.C., | § § § § | |
| Plaintiffs, | § § | |
| V. | § § | C.A. No. G-05-336 |
| | § § | |
| AGF MARINE AVIATION TRANSPORT; MARINE INSURANCE COMPANY LIMITED; and CERTAIN UNDERWRITERS AT LLOYD'S LONDON WHO ARE MEMBERS OF SYNDICATES NUMBERED 2724, 1243 and 1861, | § § § § § § § § § | |
| Defendants. | § | |

## PLAINTIFFS' FOURTH AMENDED ORIGINAL COMPLAINT

TO THE UNITED STATES DISTRICT COURT:

Plaintiffs, Goodrich Operating Company, Inc., and Petrogulf III, L.L.C., file this Fourth Amended Original Complaint against Defendants, AGF Marine Aviation Transport, Marine Insurance Company Limited, Commercial Union Assurance Company PLC, and Certain Underwriters at Lloyd's London who are members of Syndicates numbered 0724, 2724, 1243, and 1861.

### PARTIES

1. Plaintiff Goodrich Operating Company, Inc. ("Goodrich") is a domestic corporation authorized to do business in the State of Texas.

2. Plaintiff Petrogulf III, L.L.C. ("Petrogulf") is a Louisiana limited liability company authorized to do business in Louisiana. Goodrich and Petrogulf are hereinafter collectively referred to as "Plaintiffs."

3. Defendant AGF Marine Aviation Transport ("AGF") has appeared and answered through counsel.

4. Defendant Marine Insurance Company Limited ("MIC") has appeared and answered through counsel.

5. Defendant Certain Underwriters at Lloyd's London who are members of Syndicates Numbered 2724, 1243 and 1861 ("Lloyds") have appeared and answered through counsel.

6. Defendant Commercial Union Assurance Company PLC ("Commercial Union") is foreign company doing business in the State of Texas. Counsel for Commercial Union has agreed to accept service of process on its behalf. Therefore, Commercial Union will be cited to appear and answer herein by serving this Complaint on Kent E. Westmoreland, Westmoreland Hall, P.C., 2800 Post Oak Blvd., Suite 6400, Houston, Texas 77056.

7. Defendant Certain Underwriter at Lloyd's London who is a member of Syndicate Number 0724 is a foreign company doing business in the State of Texas. Counsel for this Syndicate has agreed to accept service of process on its behalf. Therefore, Syndicate Number 0724 will be cited to appear and answer herein by serving this Complaint on Kent E. Westmoreland, Westmoreland Hall, P.C., 2800 Post Oak Blvd., Suite 6400, Houston, Texas 77056. Syndicate Number 0724 will be included in the "Lloyds" referenced as used herein.

8. The above-named defendants will be collectively hereinafter referred to as "Defendants."

## JURISDICTION AND VENUE

9. Jurisdiction and venue are proper in this Court according to the provisions of 28 U.S.C. 1332(a). Specifically, diversity of citizenship exists between the parties and the amount in controversy exceeds $75,000. Venue is proper pursuant to 28 U.S.C. 1391(a)(2).

## FACTUAL BACKGROUND

10. Goodrich entered into an Oil, Gas and Hydrocarbon lease with Miami Corporation for 337 acres in East Little Cheniere Field in Cameron Parish, Louisiana.

11. Pursuant to that Oil, Gas and Hydrocarbon lease, Plaintiffs developed a drilling plan to complete the Miami Fee No. 1 well (the "Well") on the edge of the Mermentau River, approximately sixty (60) miles southeast of Lake Charles, Louisiana.

12. Goodrich has a thirty-seven and one-half percent (37.5%) working interest in the Well and Goodrich's joint venture partner, Petrogulf, holds the remaining sixty-two and one-half percent (62.5%) interest. As the operator, Goodrich provided well control insurance for one hundred percent (100%) interest in the Well.

13. On or about January 31, 2001, the Well was spudded and it was thereafter directionally drilled without incident to a total depth of 14,307 feet.

14. Goodrich's drilling plan called for the perforation of two production zones (the upper zone to be perforated from approximately 11,633 ft-11, 638 ft., and the lower zone to be perforated from approximately 11,644 ft.-11, 656 ft).

15. On or about April 4, 2001, operations to perforate the Well began, but when the perforating guns were inserted into the Well, they encountered an obstruction of unknown origin

in the production casing at a depth of 11,630 feet that prevented perforation of the production zones identified in the drilling plan.

16. On or about April 17, 2001, a coil tubing unit ("CTU") was employed to attempt to mill out the obstruction, which was apparently caused by an accumulation of heavy drilling mud in the production casing.

17. The accumulation of mud in the production tubing was preventing the penetration of the perforating guns to sufficient depth to perforate the Well as indicated in the drilling plan.

18. On or about April 22, 2001, during the milling process using the CTU at a depth of 11,590 feet, the Well suddenly pressured up due to an inflow of natural gas from some unknown production zone. The Goodrich crew was able to kill the Well by pumping zinc bromide based workover fluid into the Well bore.

19. On or about May 4, 2001, Tetra Rig No. 3, a barge mounted rig, began workover activities on the Well.

20. During the course of the workover operations, high pressure gas began flowing up the inside of the production tubing string and the Well began blowing out of control, emitting large quantities of oil and natural gas into the environment.

21. Goodrich immediately evacuated the crew and retained well control specialists from CUDD Well Control ("CUDD") to bring the Well under control. Goodrich also notified the Louisiana Department of Environmental Quality, the National Response Center and the U.S. Coast Guard in compliance with all state and federal environmental regulations.

22. CUDD successfully installed a tubing plug and brought the Well under control on or about May 7, 2001.

23. After the blowout, Goodrich had no knowledge of either the down-hole configuration of the Well or the origin of the flow.

24. Due to unsafe conditions created by pressures that continually tested the down-hole tubing plug and the surface wellhead equipment, Goodrich was unable to leave the Well shut in.

25. Goodrich analyzed the options available to address the danger presented by high pressure in the Well and determined that the safest option was to attempt to divert some of the flow from the Well into an adjacent production facility. Such diversion was intended to relieve some of the pressure in the Well.

26. Goodrich attempted some restoration of the Well immediately after the diversion, but due to the high-pressure conditions at the Well, such restoration operations were unable to be fully completed.

27. Goodrich's decision to attempt to divert the high pressure flow into an adjacent production facility was based on several factors, including but not limited to: (a) the safety of the crew; (b) the protection of the environment through the active pursuit of cleanup activities; (c) the need to repair equipment damaged by the blowout; and (d) the inability to locate a rig for an economically acceptable fee to conduct the workover operation.

28. At no time did Goodrich indicate to any of the Defendants any intention to forgo restoration of the Well to its pre-blowout configuration.

29. At the time of the blowout and at all pertinent times thereafter, Goodrich maintained energy exploration and development insurance policies issued by Burnett & Company, Inc. (the "Insurance Policies"). Policy Number HJ5242 was underwritten by Certain Underwriters at Lloyd's London who are members of syndicates numbered 0724, 2724 and

1243. Policy Number HJ5518 was underwritten by Certain Underwriters at Lloyd's London who are members of syndicates numbered 2724, 1243 and 1861. The coverage provided by the Insurance Policies included control of well insurance, redrilling/extra expense insurance (including restoration), seepage, pollution, cleanup and contamination insurance.

30. After the blowout, Plaintiffs made various claims for coverage under the Insurance Policies, and Defendants accepted coverage for the claims without reservation.

31. Defendants engaged Matthews-Daniel Company ("Matt-Dan") as adjusters for Plaintiffs' claims.

32. Matt-Dan was Plaintiffs' sole point of contact with Defendants (other than Burnett & Company, Inc.) during the claims settlement process.

33. Matt-Dan held itself out as the agent of the Defendants and Plaintiffs relied on statements by Matt-Dan for all claims settlement issues.

34. Plaintiffs provided notice to Defendants through Matt-Dan of their intention to conduct restoration and redrilling activities to attempt to approximate the Well's pre-blowout condition by submitting claims for redrilling and restoration to Matt-Dan in accordance with the Insurance Policies' claim submission procedures.

35. Matt-Dan authorized payment for certain of Plaintiffs' redrilling/restoration claims occurring immediately after the Well was brought under control.

36. Further, Plaintiffs provided notice to Defendants through Matt-Dan of their intent to attempt to obtain production from both targeted zones as indicated in the drilling plan, and Defendants acknowledged receipt of this information in various reports.

37. Plaintiffs expended $752,626.53 for redrilling/restoration of the Well from January 24, 2002 through February 14, 2002.

38. At no time prior to Plaintiffs' expenditure of $752,626.53 did Defendants inform Goodrich that such expenses were not likely to be covered by the Insurance Policies.

39. Defendants provided their final denial of coverage for Plaintiffs redrilling/restoration claims via correspondence from Burnett & Company, Inc. on July 30, 2004.

40. Pursuant to the terms of the Insurance Policies, Goodrich is entitled to coverage for costs associated with the redrilling and restoration activities to return the Well to its pre-blowout condition (collectively the "Insured Loss").

### CAUSE OF ACTION – BREACH OF CONTRACT

41. Plaintiffs hereby incorporate by reference paragraphs 1-37 as if fully set forth herein.

42. Defendants are obligated by the terms of the Insurance Policies to provide coverage to Plaintiffs to restore the Well to its pre-loss condition.

43. Notwithstanding repeated requests from Plaintiffs for payment of the Insured Loss, Defendants have failed and refused to pay the same. Defendants' refusal to pay the Insured Loss constitutes a breach of the Insurance Policies. Plaintiffs have been damaged by the Defendants' breach in the amount of the Insured Loss, plus interest, attorney's fees, consultant fees and all costs of these proceedings.

### CAUSE OF ACTION – ESTOPPEL

44. Plaintiffs hereby incorporate by reference paragraphs 1-40 as if fully set forth herein.

45. Plaintiffs informed Defendants of Plaintiffs' intention to conduct redrilling and restoration activities at the Well beginning in January of 2002.

46.     Defendants through their agent Matt-Dan failed and neglected to inform Plaintiffs that Defendants had concluded that such claims would not be covered by the Insurance Policies or, in the alternative, Defendants, through Matt-Dan, made statements to Plaintiffs indicating that such claims would be covered by the Insurance Policies.

47.     Defendants were aware that Plaintiffs relied on Matt-Dan's statements, or failure to make necessary statements, in making the determination to undertake redrilling and restoration operations.

48.     Plaintiffs expended $752,626.53 for redrilling and restoration expenses in reliance on Defendants' statements or failure to make necessary statements. Defendants are, therefore, now estopped from denying Plaintiffs' claims for redrilling and restoration expenses in the amount of $752,626.53.

### CAUSE OF ACTION – BAD FAITH

49.     Plaintiffs hereby incorporate by reference paragraphs 1-47 as if fully set forth herein.

50.     Defendants are required by the terms of the Insurance Policies to pay Plaintiffs for the Insured Loss. Defendants' refusal to pay the insured loss is unreasonable and contrary to the terms of the Insurance Policies.

51.     Article 21.21 of the Texas Insurance Code provides in pertinent part as follows:

> "The following are hereby defined as unfair methods of competition and unfair and deceptive acts or practices in the business of insurance:
>
> (10) Unfair Settlement Practices. (a) Engaging in any of the following unfair settlement practices with respect to a claim by an insured or beneficiary:
>
> * * *
>
> > (ii)   failing to attempt on good faith to effectuate a prompt, fair, and equitable settlement of a claim with respect to which the insurer's liability has become reasonably clear;

8

* * *

 (iv) failing within a reasonable time to :
  (A) affirm or deny coverage of a claim to a policy holder; or
  (B) submit a reservation of rights to a policy holder;..."

* * *

52. Defendants' liability for the Insured Loss was "reasonably clear" under the terms of the Insurance Policies.

53. Defendants have violated Article 21.21 of the Texas Insurance Code by not dealing fairly and in good faith with Plaintiffs, and as a direct result, Plaintiffs have suffered damages including the amount of the Insured Loss, plus interest, attorney's fees and all costs of these proceedings.

54. Defendants issued a preliminary denial of coverage for the Insured Loss on October 2, 2002, more than six (6) months after Plaintiffs submitted claims therefor.

55. Defendants' failure to affirm or deny coverage for the Insured Loss within a "reasonable time" violates Article 21.21 (iv) of the Texas Insurance Code and caused Plaintiffs to suffer damages including the amount of the Insured Loss, plus interest, attorney's fees and all costs of these proceedings.

## PRAYER

WHEREFORE, Plaintiffs, Goodrich Operating Company and Petrogulf III, L.L.C., seek judgment in their favor against Defendants, AGF Marine Aviation Transport; Marine Insurance Company Limited; Commercial Union Assurance Company PLC; and Certain Underwriters at Lloyd's London who are members of syndicates numbered 0724, 2724, 1243, and 1861 and ask the Court to award them:

 a. $752,626.53 plus interest for redrilling expenses;

b.     $865,300.00 plus interest for full restoration of Well to its pre-blowout configuration;

c.     Reasonable Attorney's fees, consultant fees and costs; and

d.     All other relief that the Court determines is just and equitable.

Dated: December 6, 2005.

Respectfully submitted,

**ADAMS AND REESE LLP**

*[signature]*

Peter A. McLauchlan
ATTORNEY IN CHARGE
FBN 6370/SBN 13740900
Laura D. Shelton
FBN 30069/SBN 24026157
1221 McKinney, Ste 4400
Houston, Texas 77010
Tel: 713-652-5151
Fax: 713-652-5152

**ATTORNEYS FOR PLAINTIFFS**

**CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the above and foregoing has been forwarded to the following via U.S. regular mail, postage prepaid, on this __6pm__ day of December 2005:

Mr. Kent E. Westmoreland
Williams Tower, 64th Floor
2800 Post Oak Boulevard
Houston, Texas 77056

*[signature]*

Peter A. McLauchlan