IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
GALVESTON DIVISION

| | | |
|---|---|---|
| GOODRICH OPERATING COMPANY, INC. and PETROGULF III, L.L.C., | § § § § | |
| | § | C.A. No. G-05-336 |
| Plaintiffs | § | |
| vs. | § § | |
| BURNETT & COMPANY, INC., et al | § § | |
| Defendants | § | |

## POLICY HJ5242 UNDERWRITERS' AMENDED MOTION FOR SUMMARY JUDGMENT

Plaintiffs Goodrich Operating Company, Inc. and Petrogulf III, L.L.C. sued Defendants Certain Underwriters at Lloyd's London and Companies subscribing to Policy HJ5242[i] ("Policy HJ5242 Underwriters") for coverage and bad faith under an energy, exploration and development ("EED") policy. Policy HJ5242 Underwriters move for summary judgment because policy conditions apply to preclude coverage; the policy is one of indemnity, not liability; Plaintiffs cannot prove all elements required for estoppel; and claims for insurance code violations and bad faith are barred by the applicable statute of limitations. In support, Policy HJ5242 Underwriters incorporate the arguments made below and the evidence attached to this amended motion.

---

[1] Certain Underwriters at Lloyd's London and Companies subscribing to Policy HJ5242 include Commercial Union Assurance Company PLC, Marine Insurance Company Limited, AGF Marine Aviation Transport, Syndicates at Lloyd's, London numbered 0724, 2724, 1243.

Page 1 of 15

## I. REASON FOR AMENDMENT

HJ5242 Underwriters inadvertently attached the wrong document as <u>Exhibit C</u> to their previously filed Motion for Summary Judgment against Plaintiffs. More specifically, the February 10, 2003 letter with AFE was attached in error as Exhibit C. HJ5242 Underwriters intended to attach Petrogulf Corporation's Workover Procedure dated January 7, 2002, as Exhibit C.

The Workover Procedure is correctly described in the text of the motion; it is only the document identified as Exhibit C that needs to be replaced. The February 10, 2003 letter with authorization for expenditure that originally appears as Exhibit C should now be labeled <u>Exhibit G</u>. As such, Exhibit G (May 7, 2003, letter on behalf of Underwriters) is now labeled <u>Exhibit H</u>.

Except for the noted exhibit relabeling, Policy HJ5242 Underwriters' Motion for Summary Judgment is substantively unchanged.

## II. FACTS

### A. Well History

The Goodrich Miami Fee No. 1 Well ("Well") was spudded on January 31, 2001[2] and directionally drilled to a total depth of 14,307 feet (MD) in late March 2001.[3] A 7-5/8" production liner was installed in the Well at a depth of 12,066 feet prior to completion operations. Operations to perforate the Well commenced on April 4, 2001.[4] The perforating guns encountered an

---

[2] *See* Deposition Transcript of James P. Perkins attached as Exhibit A, p.11, ll.20-22.

[3] *See* Exhibit A, p.13, l.25; p.14, ll.1-3.

[4] *See* Plaintiffs' Fourth Amended Original Complaint attached as Exhibit B, p.3, paragraph 15.

obstruction inside the production tubing at a depth of 11,630 feet (MD) and prevented the guns from being lowered to the predetermined perforation interval.[5]

On April 17, 2001 a coiled tubing unit was engaged to drill out the tubing obstruction and clean out the well.[6] During the course of a second cleanout operation (on or about April 22), it was thought that a hole was inadvertently milled through the wall of the 7-5/8" liner casing at a depth of 11,610 feet.[7] On May 4, a barge-mounted workover rig was engaged to repair the hole in the 7-5/8" casing liner and to clean out the well.[8] On May 4, 2001 a well blowout occurred.[9] Operations to control the well were successfully completed on May 7, 2001.[10]

On May 14, 2001 the well was perforated and the flow from the well was diverted into production.[11] The well was hooked up to the production facilities and opened to sales in May 2001.[12] The well remained on production until early November 2001.[13]

From January 22 through February 14, 2002, Goodrich performed workover operations to restore the well to production.[14] The Authorization for Expenditure for this work reflects that

---

[5] *See* Exhibit B, p.3-4, paragraph 15.

[6] *See* Exhibit A, p.29, l.25, p.30, ll.1-4.

[7] *See* Exhibit A, p.34, ll.3-20.

[8] *See* Exhibit B, p.4, paragraph 19.

[9] *See* Exhibit A, p.13, ll.5-8.

[10] *See* Exhibit A, p.36, l.25; p.37, ll.1-5.

[11] *See* Exhibit A, p.37, ll.17-19; p.43, ll.9-14.

[12] *See* Exhibit A, p.38, ll.19-21.

[13] *See* Exhibit A, p.46, ll.16-20.

[14] *See* Exhibit B, p.6, paragraph 37.

Goodrich only intended to perforate the well in the interval between 11,633 feet and 11,638 feet (the upper lobe).[15] The Well was restored to production on February 14, 2002. No further restoration or sidetrack operations were conducted.[16]

**B. Policy Overview**

Certificate of Insurance No. HJ5242 provides energy, exploration and development coverage to Goodrich for the policy period September 1, 1999 through March 1, 2001.[17] Coverage is also provided to Petrogulf as an additional assured by virtue of the Policy's co-venturer clause.[18] Since the Well was spudded on January 31, 2001, coverage attached under Policy HJ5242.[19] Policy HJ5242 covers Section A - Control of Well, Section B - Redrilling/Extra Expense, and Section C - Seepage and Pollution, Cleanup and Contamination, with a combined single limit of liability of $10,000,000, subject to a retention of $100,000.[20]

### III. HISTORY OF CLAIM

**A. Initial Claim.** Matthews-Daniel was instructed to investigate and adjust the loss on or about May 11, 2001. Following a determination that a well control incident had incurred, the loss was adjusted, proofs of loss taken and by early 2002, Underwriters paid $2,826,957, allocating

---

[15] *See* Petrogulf Corporation's Workover Procedure dated January 7, 2002, and attached as Exhibit C.

[16] *See* Deposition Transcript of Douglas Anderson III attached as Exhibit D, p.24, l.25, p.25 ll.1-11.

[17] *See* EED Policy HJ5242 attached as Exhibit E, Certificate of Insurance.

[18] *See* Exhibit E, General Conditions, p.1.

[19] Plaintiffs have also sued Underwriters subscribing to EED Policy HJ5518, effective March 1, 2001 through March 1, 2002. Policy HJ5518 Underwriters have brought their own motion for summary judgment requesting dismissal from this litigation because coverage does not attach under that policy.

[20] *See* Exhibit E, Declarations.

$624,008 for control of well expenses, $353,589 for redrilling/restoration, and $1,849,360 for pollution clean-up and containment.

**B.    Supplemental Claim.**  In mid-2002, Goodrich presented a supplemental claim to Underwriters totaling $752,626.53 for costs allegedly incurred between January 22 and February 14, 2002 to perform restoration operations and return the Well to production. On October 2, 2002 and on behalf of Underwriters, Burnett & Company, Inc. sent a letter to Goodrich denying the supplemental claim based on the fact the Well had been safely diverted into production.[21]

**C.    Second Supplemental Claim.**  On February 10, 2003, Goodrich again outlined its position on coverage and asked Underwriters to reconsider their position with respect to the supplemental claim.[22] At this time, Goodrich sought recovery of an additional $865,300 associated with drilling a sidetrack well to complete the bottom lobe of the production interval based on cost estimates set forth in a proposed Authorization for Expenditure attached to the letter.[23] The sidetrack was never drilled.[24] By letter dated May 7, 2003, Underwriters reiterated its denial of Plaintiffs' supplemental claim and denied Plaintiffs' second supplemental claim.[25]

**D.    Litigation.**  On December 7, 2005, Plaintiffs filed their Fourth Amended Original Complaint and added Certain Underwriters at Lloyd's London and Companies subscribing to the Policy HJ5242. Plaintiffs seek coverage under Policy HJ5242, reimbursement of expenses

---

[21] *See* October 2, 2002 denial letter from Burnett & Company, Inc. attached as Exhibit F; Exhibit D, p.40, ll.5-9.

[22] *See* February 10, 2003 letter with AFE attached as Exhibit G.

[23] *See* Exhibit G and Exhibit D, p.40, ll.10-17.

[24] *See* Exhibit A, p.44, ll.11-25; Exhibit D, p.24, ll.12-17.

[25] *See* Letter dated May 7, 2003, attached as Exhibit H.

associated with redrilling the Well after a blowout ($752,626.53) and pre-payment of the cost to restore the Well to its pre-blowout configuration ($865,300).[26] Trial is scheduled for July 24, 2006.

## IV. GROUNDS FOR SUMMARY JUDGMENT

Policy HJ5242 Underwriters move for summary judgment because Policy conditions apply to preclude coverage; the Policy is one of indemnity, not liability; Plaintiffs cannot prove all elements required for estoppel; and claims for insurance code violations and bad faith are barred by the applicable statute of limitations. Policy conditions apply to preclude coverage for two reasons:

(1) After the blowout, the Well was safely diverted to production; and

(2) Actual restoration or redrilling did not commence within 540 days after blowout or expiration of the Policy (applies to second supplemental claim).

The indemnity nature of the Policy precludes coverage for the second supplemental claim because as of filing their lawsuit on December 7, 2005, Plaintiffs had not incurred any costs/expenses for sidetracking the Well.

Plaintiffs' argument that Underwriters are estopped from denying the supplemental claim for redrill/restoration expenses fails because the doctrines of waiver and estoppel cannot be used to create coverage where none exists according to the terms of the Policy.

Plaintiffs' claims that Underwriters 1) unreasonably refused to pay the insured loss, 2) failed to affirm or deny coverage within a reasonable time, and 3) breached their duty of good faith and fair dealing are barred by the applicable two-year statute of limitations.

## V. ARGUMENTS AND AUTHORITIES

### A. No Coverage for Redrilling Expenses: Well Safely Diverted to Production

---

[26] *See* Exhibit B, p. 9-10, Prayer a. and b.

Plaintiffs claim $752,626.53 for reimbursement of expenses incurred in January and February 2002 and associated with restoring the Well to production after the Well was safely diverted to production following the May 4, 2001 blowout. Policy HJ5242 indicates coverage does not exist for redrill or restoration costs in situations where the Well's flow can be safely diverted into production. Section B, Redrilling/Extra Expense, subsection 1.b, reads, in pertinent part:

> There shall be no coverage under Section B for restoration or redrilling of any well whose flow can be safely diverted into production, including by completing through drill stem left in the well insured hereunder, or which can be completed through a relief well(s) drilled for the purpose of controlling a well.[27]

During his deposition, Goodrich's corporate representative, James Perkins, admitted that after the blowout, the Well was diverted to production.[28] Mr. Perkins also discussed the safety of the diversion process and testified, "Well, we knew we could do it" and "it was easy to divert to production";[29] "I don't think it created any greater risk.";[30] "I don't remember specific conversations [concerning safety issues]";[31] "It was not an unsafe operation to divert the well to production.";[32] and "[I]t seemed more plausible that the best thing to do was to divert the Miami Corporation No. 1 to production."[33] Mr. Perkins testified that the Well remained on production until November 2001.[34]

---

[27] See Exhibit E, p. 15.

[28] See Exhibit A, p.37, ll.17-19; p.43, ll.9-14.

[29] See Exhibit A, p.40, ll.11-21.

[30] See Exhibit A, p.40, ll.22-25, p.41, ll.1-2.

[31] See Exhibit A, p.41, ll.7-16.

[32] See Exhibit A, p.42, ll.3-4.

[33] See Exhibit A, p.43, ll.9-14.

[34] See Exhibit A, p.46, ll.16-20.

The supplemental claim for damages is based upon Plaintiffs reentering the Well on January 22, 2002 for workover operations to restore the Well to production and completing these operations on February 14, 2002, at which point the Well was again returned to production.[35]

Plaintiffs' first supplemental claim for $752,626.53 involves these workover operations, however, after the May 4, 2001 blowout, the Well was safely diverted to production. Since the Policy indicates that Underwriters will not pay for any redrill or restoration costs in connection with a well whose flow can be safely diverted into production, no coverage exists for this aspect of the claim.

### B. No Coverage for Estimated Sidetrack Costs in Second Supplemental Claim: Policy HJ5242 is an Indemnity Policy

Plaintiffs cannot maintain their second supplemental claim for "full restoration of Well to its pre-blowout configuration" because they have not incurred any restoration expenses. Plaintiffs first presented their second supplemental claim ($865,300) to Underwriters on February 10, 2003.[36] The claim is based on the Authority for Expenditure ("AFE") attached to the February 10 letter that estimates the cost to "[r]e-enter & clean out the well to the top of the packer, sidetrack the well and drill to [sic] through the pay sand. Set a 5" liner and complete."[37]

Policy HJ5242's Section B, Redrilling/Extra Expense, subsection 1. Regarding coverage reads, in pertinent part:

> Underwriters agree, subject to the combined single limit of liability, terms and conditions of this policy, to reimburse the assured for

---

[35] *See* Exhibit B, p.6, paragraph 37.

[36] *See* Exhibit G.

[37] *See* Exhibit G.

>
> actual costs and/or expenses reasonably incurred to restore or redrill a well insured hereunder...:[38]

The Policy language of the Redrill section provides that Underwriters will not be liable for restoration until actual costs and expenses are incurred. Policy HJ5242 is one of indemnity, as that type of insurance policy is described by the Fifth Circuit.[39]

During their depositions on December 7, 2005, Goodrich representatives testified that the sidetrack operations proposed by the AFE were never conducted.[40] In fact, Mr. Douglas Anderson III, Vice President of Goodrich, testified that nothing had been done to the Well since February 2002.[41] As a matter of law, Plaintiffs cannot recover for the estimated cost associated with the projected restoration activities (*i.e.* sidetracking) because Plaintiffs never incurred costs/expenses for these activities.

### C.  No Coverage for Second Supplemental Claim: Restoration Did Not Commence Within 540 Days

Plaintiffs cannot maintain their second supplemental claim for restoration costs ($865,300) because they did not begin restoration operations within 540 days from either the date of the blowout or the expiration of the Policy.

Policy HJ5242, Section B, Redrilling/Extra Expense, subsection 1.f., reads, in pertinent part:

> In any circumstances, Underwriters' liability under this section B for costs and expenses shall cease (1) if actual restoration or redrilling has not commenced within 540 days after (a) the date of the accident or occurrence giving rise to coverage under this section B or (b) the

---

[38] *See* Exhibit E, p.15.

[39] *See Stuyvesant Ins. Co. of New York v. Nardelli*, 286 F.2d 600, 602-03 (5th Cir. 1961).

[40] *See* Exhibit A, p.44, ll.11-25; Exhibit D, p.24, ll.12-17.

[41] *See* Exhibit D, p.24, l.25, p.25 ll.1-11.

date of cancellation or expiry of this policy, whichever shall later occur;[42]

Five hundred, forty days from the date of the blowout giving rise to coverage under Section B (May 4, 2001), is October 6, 2002. Five hundred, forty days from the date of Policy expiration (March 1, 2002) is August 23, 2003. As of Goodrich's depositions taken on December 7, 2005, Plaintiffs had not conducted any sidetracking operations.[43] Plaintiffs did not begin sidetracking operations within the prescribed time period and as a matter of law, coverage does not exist for Plaintiffs' second supplemental claim.

### D. Estoppel

Generally, Texas law defines estoppel as "conduct which causes the other party to materially alter his position in reliance on that conduct."[44] In support of their claim, Plaintiffs indicate they informed Underwriters of their intention to conduct redrilling and restoration activities at the Well beginning in January 2002.[45] Plaintiffs claim Underwriters (through their agent Matthews-Daniel) failed to inform Plaintiffs that Underwriters had concluded that these redrill/restoration claims would not be covered or made statements to Plaintiffs indicating that these claims would be covered.[46] Plaintiffs claim that Underwriters were aware that Plaintiffs relied on alleged statements (or omissions) by Matthews-Daniel when deciding to redrill and restore the Well.[47] Plaintiffs claim that

---

[42] *See* Exhibit E, bottom of p.15.

[43] *See* Exhibit A, p.44, ll.23-25; Exhibit D, p.24, l.25, p.25 ll.1-11.

[44] *See Monumental Life Ins. Co. v. Hayes-Jenkins*, 403 F.3d 304, 311 (5th Cir. 2005)(citing *Braugh v. Phillips*, 557 S.W.2d 155, 158 (Tex.App. – Corpus Christi 1977, reh.d.).

[45] *See* Exhibit B, p.7, paragraph 45.

[46] *See* Exhibit B, p.8, paragraph 46.

[47] *See* Exhibit B, p.8, paragraph 47.

they spent $752,626.53 on redrilling and restoring the Well based on Underwriters' statements or omissions.[48]

Messrs. Anderson and Perkins testified that they recalled several meetings after February 2002 concerning the redrill/restoration expenses incurred during January and February 2002. Mr. Anderson recalls initiating the first meeting with Matthews-Daniel to discuss the status of the claim for redrill/restoration <u>after</u> Goodrich performed the restoration work in January/February 2002.[49] Mr. Anderson testified that the meeting took place,[50] and he did not recall Matthews-Daniel stating, "This bill will be paid."[51] Instead, he left the meeting with the impression that Matthews-Daniel understood the claim, thought it was valid, and would submit the claim to Underwriters for payment.[52]

Mr. Perkins recalls two meetings with Matthews-Daniel <u>after</u> the January/February 2002 restoration operations.[53] The topic of these meetings was restoration costs.[54] Like Mr. Anderson, Mr. Perkins would not confirm that Matthews-Daniel represented to Goodrich that Underwriters

---

[48] *See* Exhibit B, p.8, paragraph 48.

[49] *See* Exhibit D, p.17, l.25; p.18, ll.1-22.

[50] *See* Exhibit D, p.19, ll.21-25.

[51] *See* Exhibit D, p.20, ll.1-5.

[52] *See* Exhibit D, p.20, ll.5-14.

[53] *See* Exhibit A, p.67, ll.11-15; p.68, ll.10-13.

[54] *See* Exhibit A, p.69, ll.3-13.

were going to pay the restoration claim.[55] Instead, Mr. Perkins left the meeting(s) with the "impression" that Underwriters would pay the claim.[56]

Plaintiffs are unable to meet 2 of the 4 elements of estoppel. First, Goodrich did not rely on any statements of Matthews-Daniel to its detriment. Messrs. Anderson and Perkins indicate that the meetings occurred <u>after</u> the restoration operations had been conducted. As such, the loss occurred prior to any alleged representation upon which reliance would have occurred. Second, there exists no false representation or concealment of facts. Neither Mr. Anderson nor Mr. Perkins indicated that Underwriters (or their agents) represented that coverage for the restoration costs existed.

Underwriters made no representation of coverage to Goodrich, and Goodrich performed the restoration operations prior to the alleged misrepresentations. As a matter of law, Plaintiffs cannot prove that Underwriters are estopped from denying coverage under Policy HJ5242.

### E. **Texas Insurance Code/Bad Faith Claims Barred by Statute of Limitations**

Plaintiffs claim that Underwriters have violated the Texas Insurance Code by unreasonably refusing to pay the insured loss and failing to affirm or deny coverage within a reasonable time. Statutory causes of action accrue on the date coverage is denied.[57] A party must file a cause of action under the Texas Insurance Code within two years after the party discovered or should have discovered the violation.[58]

---

[55] *See* Exhibit A, p.69, ll.23-25; p.70, ll.1-13.

[56] *Id.*

[57] *See Long v. State Farm Fire and Casualty Co.*, 828 S.W.2d 125, 129 (Tex.App. – Houston [1st Dist.] 1992, writ denied).

[58] *See Provident Life & Acc. Ins. Co. v. Knott*, 128 S.W.3d 211, 221 (Tex. 2003).

Likewise, Plaintiffs' cause of action for bad faith is subject to a two-year statute of limitations.[59] A suit for breach of the duty of good faith and fair dealing accrues on the date an insurer denies a claim for coverage.[60] In other words, a bad faith cause of action arises when an insurer unreasonably fails to pay an insured under the policy.[61]

By letter dated October 2, 2002, Underwriters denied Plaintiffs' supplemental claim.[62] Mr. Anderson testified that he received and understood the October 2nd letter indicating that Underwriters were not going to pay the claim.[63] October 2, 2002, is the date on which Underwriters denied Plaintiffs' supplemental claim and Plaintiffs' causes of action with regard to the supplemental claim became viable. Pursuant to the applicable statute of limitations, Plaintiffs had until October 2, 2004, to bring a lawsuit against Underwriters for any statutory violations and a breach of the duty of good faith and fair dealing relative to their supplemental claim.

By letter dated May 7, 2003, Underwriters denied Plaintiffs' second supplemental claim.[64] May 7, 2003, is the date on which Plaintiffs' causes of action with regard to the second supplemental claim became viable. Plaintiffs had until May 7, 2005, to bring suit against Underwriters for any statutory violations and a breach of the duty of good faith and fair dealing relative to their second supplemental claim.

---

[59] *See* Tex.Civ.Prac. & Rem. Code §16.003(a).

[60] *See Murray v. San Jacinto Agency*, 800 S.W.2d 826, 828 (Tex.1990).

[61] *See Murray*, 800 S.W.2d at 829.

[62] *See* Exhibit F and Exhibit B, p.9, paragraph 54.

[63] *See* Exhibit D, p.40, ll.5-9.

[64] *See* Exhibit H.

Plaintiffs initiated a cause of action against Policy HJ5518 Underwriters (the incorrect policy) on June 10, 2005. Plaintiffs did not bring their cause of action against Policy HJ5242 until December 7, 2005. Using either date, the applicable statute of limitations serves to prevent Plaintiffs from bringing their supplemental or second supplemental claims pursuant to the Texas Insurance Code and for bad faith.

## VI. **CONCLUSION**

Policy HJ5242 Underwriters are entitled to summary judgment on all of Plaintiffs' claims because Policy conditions apply to preclude coverage; the Policy is one of indemnity, not liability; Plaintiffs cannot prove all elements necessary to prove estoppel; and claims for insurance code violations and bad faith are barred by the applicable two-year statute of limitations.

Policy HJ5242 Underwriters pray that the Court grant this amended motion and issue a final summary judgment in favor of these Underwriters on all Plaintiffs' causes of action. Underwriters pray for all such other and further relief, both general and special, at law and in equity, to which they may show themselves justly entitled.

Respectfully submitted,

Kent E. Westmoreland
TBN: 21229800
SDN: 03244
2800 Post Oak Blvd., Suite 6400
Houston, Texas 77056
Phone: 713.871.9000
Fax: 713.871.8962
**ATTORNEY-IN-CHARGE FOR INTERESTED UNDERWRITERS**

OF COUNSEL:
WESTMORELAND HALL, P.C.
Candace A. Ourso
TBN: 24008952
SDN: 23217
2800 Post Oak Blvd., Suite 6400
Houston, Texas 77056
Phone: 713.871.9000
Fax 713.871.9000

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the above and foregoing pleading was served upon all counsel of record via electronic mail or U.S. mail on this the ____ day of February, 2006, as follows.

Peter A. McLauchlan - *Counsel for Plaintiffs*
Laura D. Shelton
Adams & Reese LLP
1221 McKinney, Suite 4400
Houston, Texas 77010

Kent E. Westmoreland